IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVID MARTIN,                            )      CASE NO. 1:12-cv-0766
                                         )
              Plaintiff,                 )      JUDGE LESLEY WELLS
                                         )
        v.                               )      MAGISTRATE JUDGE
                                         )      KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                   )
SECURITY ADMINISTRATION,[1]              )
                                         )      **REPORT AND RECOMMENDATION**
              Defendant.                 )

Plaintiff David Martin ("Plaintiff" or "Martin") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I.  Procedural History

Martin filed his application for Disability Insurance Benefits on June 18, 2008.[2]  Tr. 98-103.  The application alleged a disability onset date of July 1, 2006.  Tr. 98.  Martin alleged disability based on mental illness, hearing voices, and medication-induced drowsiness.  Tr. 119, 173.  After initial denial by the state agency (Tr. 73-75) and denial upon reconsideration (Tr. 79-

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Martin first submitted an application for disability benefits on June 15, 2007.  Tr. 92.  He submitted a second application for disability benefits on June 18, 2008 (Tr. 98), and it is this second application that was considered by the Administrative Law Judge (Tr. 18).

81), Martin requested a hearing (Tr. 84), and an administrative hearing was held before

Administrative Law Judge Pamela E. Loesel ("ALJ") on July 12, 2010.  Tr. 24-66.

In her September 1, 2010 decision (Tr. 9-18), the ALJ determined that Martin had not

been under a disability from June 18, 2008, through the date of the ALJ's decision.  Tr. 18.

Martin requested review of the ALJ's decision by the Appeals Council on October 16, 2010.  Tr.

5.  On February 3, 2012, the Appeals Council denied Martin's request for review, making the

ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.    Personal and Vocational Evidence

Martin was born on February 7, 1966.  Tr. 92, 113.  He completed his GED while in

prison.  Tr. 49, 523.  He has an extended history of incarceration, primarily for drug-related

convictions.  Tr. 34, 491, 523, 697.  He performed temporary commercial painting work in 1994

and 1996, manual labor in a factory from 1998-2000, and roofing work in the summer of 2006.

Tr. 32-33, 36, 120, 157-61.  Most recently, he performed odd jobs while living at the Salvation

Army, including sorting donations.  Tr. 32, 525.

### B.    Medical Evidence

#### 1.    Treatment Records

Martin has a longstanding history of alcohol and drug abuse, beginning with use at the

age of seven.  Tr. 494-97, 523, 668.  Martin first sought mental health treatment at Bridgeway,

Inc. ("Bridgeway"), and had an adult diagnostic assessment on May 14, 2007.  Tr. 491-501, 575.

He related he was unstable and felt suicidal at times, had disorganized thoughts, and heard his

mother's voice.  Tr. 491.  He also described a history of violence in prison and a recent charge of

domestic violence against his then girlfriend.  Tr. 491-96.  He was diagnosed with prolonged

post-traumatic stress, depression, and polysubstance dependence, and assigned a Global

Assessment of Functioning ("GAF") score of 50.[3]  Tr. 499.

Martin thereafter had two initial psychiatric evaluations at Bridgeway on May 30, 2007

and June 26, 2007.  Tr. 508-11, 504-05.  In May, he was diagnosed with mood disorder NOS,[4]

rule-out major depressive disorder single episode, and a history of polysubstance abuse vs

dependence, and assigned a GAF score of 45-50.  Tr. 510.  He was also prescribed a new

medication, Depakote ER.  Tr. 511.  In June, he indicated symptoms of isolation, chronic

suicidal thoughts, and nightmares.  Tr. 504.  Dr. Joselita Chua, Martin's treating psychiatrist at

Bridgeway, diagnosed him with mood disorder NOS vs mood disorder due to substance abuse vs

schizoaffective disorder and assigned a GAF score of 50.  Tr. 505.

At another Bridgeway visit on July 24, 2007, Martin reported the recent death and burial

of his mother, but he "[did] not feel grief about it."  Tr. 502.  He also indicated better control

over his temper with the addition of his Zyprexa medication but was reluctant to increase the

dosage.  Tr. 502-03.  He was diagnosed with mood disorder vs mood disorder substance use vs

schizoaffective disorder and rule-out antisocial personality disorder.  Tr. 503.

On August 21, 2007, Dr. Chua submitted a medical questionnaire diagnosing him with

mood disorder NOS vs substance-induced mood disorder vs schizoaffective disorder.  Tr. 515.

She indicated that he "may be easily frustrated and may react with anger when he feels

provoked, but is more calm now with treatment."  Tr. 514.  Martin followed up with Dr. Chua on

September 26, 2007, when he reported that he was able to control his temper and that his

---

[3] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL HEALTH DISORDERS 34 (American Psychiatric Association, 4th ed. 2000) [hereinafter DSM-IV-TR].  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

[4] NOS refers to a "not otherwise specified" diagnosis.  *Id.* at 4.

medication-induced drowsiness could be controlled by adjusting the time he takes his medications the night before.  Tr. 590.  He also had "much less" aural hallucinations and no visual ones.  Tr. 590.  There was no change in diagnosis from his previous appointment.  Tr. 591. Monique Reed, Martin's caseworker, opined on October 12, 2007, in a Third Party Clarification that he "could be employed if he takes his medication and stays stable."  Tr. 165.

On April 30, 2008, Martin had another appointment at Bridgeway.  Tr. 593-94.  He reported that he had been out of medications for approximately 40 days, and that, as a result, his symptoms had been worsening, including an increase in aural hallucinations of his mother's voice.  Tr. 594.  However, he did not indicate any side effects and his diagnosis remained the same (i.e. mood disorder NOS vs substance-induced mood disorder vs schizoaffective disorder and rule-out antisocial personality disorder).  Tr. 593-94.

After his application for benefits was filed on June 18, 2008, Martin continued to report to Bridgeway once a month for treatment throughout the rest of the year.  Tr. 98-103, 697-98, 695-96, 693-94, 691-92, 689-90, 687-88.  At his appointment on July 7, 2008, he reported that he felt "alright" while on medications.  Tr. 697.  He further noted an upcoming court appearance for public intoxication.  Tr. 697.  Also, at that appointment he claimed to hear his mother's voice "cursing" him (Tr. 697), but at the rest of his appointments that year he denied having any hallucinations (Tr. 695, 693, 691, 689, 687).  Furthermore, although he complained of medication-induced drowsiness on August 12, 2008 (Tr. 695), he did not report any side effects in July, September, November, or December (Tr. 697, 693, 689, 687).  Martin also had a physical exam at Care Alliance for admission to a homeless shelter on September 16, 2008, and the physician concluded he was a recovering alcoholic and had PTSD and depression, which was being treated at Bridgeway.  Tr. 656.

Martin had his final appointment at Bridgeway on January 7, 2009 (Tr. 685-86), when he denied having any hallucinations, aural or visual, and stated that his medications kept his mood "even." Tr. 685. He also denied any changes in sleep. Tr. 685. Martin then transferred to and began receiving treatment from Mental Health Services ("MHS"), where he underwent an integrated assessment on February 5, 2009. Tr. 661-72. He self-described his illness as "PTSD," and concluded it caused him to hear voices and have "real deep depression at times." Tr. 665. He related that he began hearing the voice of his mother at age 40, which would speak to him in negative terms. Tr. 655. He also communicated that his medications seemed to help, and denied having any side-effects. Tr. 666. He was diagnosed with PTSD, mood disorder NOS, and alcohol dependency, and assigned a GAF score of 50. Tr. 672.

On February 13, 2009, Martin had an appointment at MHS with Dr. Chua,[5] where he reported his mood as "stable," good sleep, and good compliance with his medications. Tr. 707. He also indicated that he had not had any aural hallucinations since November 2008, but that he had had some visual hallucinations from watching TV. Tr. 708. Dr. Chua diagnosed him with mood disorder NOS vs mood disorder secondary to drugs and alcohol vs schizoaffective disorder, polysubstance dependence and antisocial personality disorder, and assigned a GAF score of 60-65.[6] Tr. 708.

At a follow-up appointment with Dr. Chua on March 13, 2009, Martin continued to report good sleep and medication compliance. Tr. 683. The only medication side-effect he indicated was weight gain. Tr. 683. He also reported visual, but no aural, hallucinations. Tr.

---

[5] Dr. Chua appears to have also transferred from Bridgeway to MHS. Tr. 593.

[6] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR at 34. A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

683.  Dr. Chua diagnosed him with mood disorder NOS vs schizoaffective disorder vs major depression, polysubstance dependence and rule-out antisocial personality disorder.  Tr. 683. Martin then had another follow-up appointment with Dr. Chua on August 17, 2009.  Tr. 683.  At that time he indicated "oversleeping" as a medication side-effect, and that aural hallucinations of his mother had returned.  Tr. 683.  His diagnosis remained the same from his March 13, 2009 appointment.  Tr. 683.  Martin's treatment at MHS was then interrupted when he served a period of six months of incarceration from September 2009 to March 2010 for forgery.  Tr. 48-49, 680.

Martin returned to MHS for an appointment with a nurse, Judy Karam, on March 2, 2010. Tr. 712.  He denied having visual hallucinations, but indicated that he still heard voices.  Tr. 712. He further stated that his only medication side-effect was dry mouth, for which the prescribing physician had decreased his dosage.  Tr. 712.  Martin then returned to MHS and met with the nurse again on March 8, 2010; he denied medication side-effects and both aural and visual hallucinations.  Tr. 680.  He also denied alcohol or drug use, but the nurse detected alcohol on his breath.  Tr. 680.

On March 16, 2010, Martin had an appointment with Dr. Chua at MHS, where he also met with nurse Karam.  Tr. 679, 703.  He indicated to Dr. Chua that he still heard his mother's voice, but denied having any aural or visual hallucinations to the nurse.  Tr. 679, 703.  He also reported side-effects of weight gain and sedation to Dr. Chua, but again denied having any side-effects to the nurse.  Tr. 679, 703.  Dr. Chua diagnosed Martin with mood disorder NOS vs schizoaffective disorder, polysubstance dependence, and antisocial personality disorder.  Tr. 703.

Martin met with nurse Karam again on March 30, 2010; his mood was "ok," and he indicated he had no aural or visual hallucinations and no medication side-effects.  Tr. 711. However, when he met with her again the next day, he indicated that he still heard voices but that

they were now "blunted."  Tr. 678.  His mood was "good," and he again denied any visual hallucinations and medication side-effects.  Tr. 678.

On April 2, 2010, Travis Johnson, Martin's caseworker at Oriana House, wrote a "to whom it may concern" letter, indicating that, without medication, Martin's ability to function "quickly deteriorates."  Tr. 648.  Furthermore, he stated that Martin's "psychiatric disability [makes] him unable to work."  Tr. 648.  Mr. Johnson wrote a second "to whom it may concern" letter on April 29, 2010, indicating that Martin was in need of health services for "intensity anxiety, trauma, mood disorder not otherwise specified, schizoaffective disorder, bipolar disorder, posttraumatic stress disorder, antisocial personality disorder, and negative thinking distortions."  Tr. 653.

Martin met with both Dr. Chua and nurse Karam on April 13, 2010.  Tr. 676-77.  He indicated to Dr. Chua an increase in aural hallucinations of his mother "cursing" him, but no visual hallucinations; however, to the nurse, he denied having any hallucinations.  Tr. 676-77.  He further reported fatigue and weight gain as medication side-effects to Dr. Chua, but again denied having any side-effects to the nurse.  Tr. 676-77.  Dr. Chua diagnosed him with mood disorder NOS vs schizoaffective disorder vs bipolar disorder, PTSD, and polysubstance dependence.  Tr. 677.

On April 27, 2010, Martin again met with Dr. Chua and nurse Karam.  Tr. 674-75.  To Dr. Chua, he reported aural, but no visual, hallucinations and weight gain as a medication side-effect.  Tr. 675.  Dr. Chua indicated his weight gain was a result of his Risperdal, and ordered the drug discontinued from his treatment.  Tr. 675.  To the nurse, Martin's mood was "ok," and he reported no hallucinations or side-effects.  Tr. 674.  However, he did state that he had been involved in two different "physical altercations" within the past two weeks.  Tr. 674.

7

On May 11, 2010, Martin had another appointment with Dr. Chua and nurse Karam.  Tr. 710, 714.  He again indicated aural, but no visual, hallucinations to Dr. Chua; he also denied having any medication side-effects.  Tr. 714.  However, Martin indicated to the nurse that he did not have any hallucinations, and again denied any side-effects.  Tr. 710.  Nurse Karam indicated in her progress note that Martin had a "long history of non-compliance with medications, using crack and alcohol[,] becoming psychotic and ending up in jail," and would therefore continue on a biweekly medication program.  Tr. 710.

Martin met with nurse Karam to have a new prescription filled on May 25, 2010.  Tr. 709.  He denied having any hallucinations or medication side-effects, and his mood was "ok."  Tr. 709.  Nurse Karam also noted that it was the "first time" Martin had "reached mental stability in many, many years," so he was to continue to maintain a biweekly medication program.  Tr. 709.

On June 9, 2010, Martin met with Dr. Chua and appears to have indicated no aural or visual hallucinations.  Tr. 713.  He also denied having any medication side-effects, and noted his upcoming hearing regarding social security benefits.  Tr. 713.  Dr. Chua diagnosed him with mood disorder NOS vs schizoaffective disorder vs bipolar disorder, PTSD, polysubstance dependence, and antisocial personality disorder.  Tr. 713.

2.     **State Agency Reviewing and Consulting Physicians**

a.     **Consulting Physician David House, Ph.D**

On September 17, 2007, David House, Ph.D., performed a one-time psychological examination of Martin.  Tr. 522-27.  He indicated that Martin appeared subdued and his affect was blunted.  Tr. 523.  Martin reported that he felt sleepy a lot from his medications and complained of "anxiety attacks all the time."  Tr. 524.  He also indicated that the TV talked to

him daily, and that he heard the voices of people from his past. Tr. 524. Dr. House's diagnoses included psychotic disorder NOS, adult antisocial behavior, and polysubstance abuse in reported remission. Tr. 525-26. He also assigned a GAF of 40 "based upon some difficulties processing perception and thought."[7] Tr. 527. He described Martin's work-related mental capabilities as follows:

1.    Concentration and attention are at least moderately limited due to apparent psychotic process.

2.    Ability to understand and follow directions appears mildly limited. He should be able to follow directions to a couple of steps.

3.    Ability to withstand stress and pressure appears at least moderately limited primarily due to what he describes as a psychotic process. The evaluator would recommend obtaining records from Bridgeway or his treating source. If there is any discrepancy between this examiner's diagnosis and the diagnosis from the treating source, the evaluator would defer to the treating source.

4.    Ability to relate to others and deal with the general public appears moderately limited. He generally does not work around others and, although he is involved with donations, it is primarily sorting them rather than taking them in.

5.    Level of adaptability appears mildly limited. He does receive treatment.

6.    Mr. Martin's insight into his current situation and overall level of judgment appear at least moderately limited.

Tr. 526. He concluded that Martin "participates to some degree in routine daily household responsibilities. He would appear to require supervision in the management of his daily activities, and in the handling of his financial affairs. His overall level of functioning is at a reduced level of efficiency." Tr. 526.

---

[7] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34.

### b.    Reviewing Physicians

### i.    Kristen Haskins, Psy.D.

On October 18, 2007, having received medical evidence of record, state agency reviewing physician Kristen Haskins completed a Psychiatric Review Technique and Mental RFC.  Tr. 529-46.  The Psychiatric Review Technique reflects that Dr. Haskins analyzed Martin under Listings[8] 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), and 12.09 (Substance Addiction Disorders).  Tr. 533.  Dr. Haskins opined that under the "B" criteria of the listings, Martin had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. 543.  She also found that the evidence did not establish the presence of "C" criteria.  Tr. 544.  Martin thus did not meet the requirements of any listing.  Tr. 533.

In the Mental RFC, Dr. Haskins rated Martin as having either no significant limitations or no limitations in 8 of the 20 rated categories and as having moderate limitations in 12 categories: ability to remember locations and work-like procedures; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability

---

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; and ability to set realistic goals or make plans independently of others.  Tr. 529-30.  She opined that Martin is "capable of moderately complex tasks in a setting without over the shoulder supervision (i.e. more remote supervision), doing independent tasks not requiring cooperation with others for task completion, static setting, no strict production quotas or speedy performance, and no supervision of others or responsibility for conflict resolution."  Tr. 532.

### ii.      Jennifer Swain, Psy.D.

On September 1, 2008, having received medical evidence of record, state agency reviewing physician Jennifer Swain completed a Psychiatric Review Technique and Mental RFC.  Tr. 629-46.  The Psychiatric Review Technique reflects that Dr. Swain analyzed Martin's impairments under Listings 12.04 (Affective Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders).  Tr. 629.  Dr. Swain found that Martin suffered from: mood disorder; antisocial personality disorder; and polysubstance dependence.  Tr. 632, 636-37. Dr. Swain opined that under the "B" criteria of the listings, Martin had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. 639.  She also found that the evidence did not establish the presence of "C" criteria.  Tr. 640.  Martin thus did not meet the requirements of any listing.  Tr. 629.

In the Mental RFC, Dr. Swain rated Martin as having either no significant limitations or no limitations in 11 of the 20 rated categories and as having moderate limitations in 9 categories:

ability to understand and remember detailed instructions; ability to carry out detailed

instructions; ability to maintain attention and concentration for extended periods; ability to work

in coordination with or proximity to others without being distracted by them; ability to complete

a normal workday and workweek without interruptions from psychologically based symptoms

and to perform at a consistent pace without an unreasonable number and length of rest periods;

ability to interact appropriately with the general public; ability to accept instructions and respond

appropriately to criticism from supervisors; ability to get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; and ability to respond appropriately to

changes in the work setting.  Tr. 643-44.  She opined that Martin "retains the capacity to learn

and perform simple, repetitive tasks in a non-public environment where tasks are routine and

predictable and production standards are flexible. He would likely perform best in a more

solitary setting without over-the-shoulder supervision."  Tr. 645.

### iii.    David Dietz, Ph.D.

On November 17, 2008, having "reviewed all the information in the file," state agency

reviewing physician David Dietz completed a case analysis.  Tr. 647.  Dr. Dietz affirmed Dr.

Swain's assessment as written.  Tr. 647.

## C.    Testimonial Evidence

### 1.    Martin's Testimony

Martin was represented by counsel and testified at the administrative hearing.  Tr. 30-55.

He testified that he was currently staying at Oriana House (Tr. 31) and had previously stayed at

the Salvation Army (Tr. 32).  He does not drive and had never had a driver's license.  Tr. 31-32.

He had gotten to the hearing on a bus that helps transport the homeless.  Tr. 42.

Martin indicated that he had spent a large portion of his life in and out of prison.  Tr. 34.
As a result, he had never held a job for longer than about six months.  Tr. 34-35.  His longest job
was working as a roofer, which lasted for approximately six months during the summer.  Tr. 35.
However, he testified that his carpal tunnel caused him to drop bundles, and he was not re-hired
the following season.  Tr. 35.

Martin testified that he takes doxepin, Depakote, and Zyprexa.  Tr. 39.  He indicated the
medications keep his mood "stabilized" and that the doxepin keeps him from lashing out, but he
still hears voices.  Tr. 39.  He claimed to hear the voices twice a week, but they could increase
after overwhelming events.  Tr. 40.  He also indicated that weight gain and sleepiness were side-
effects of his medication.  Tr. 41.

Martin then testified about his history of substance abuse.  Tr. 45-47.  He reported that it
had been about four or five years since he used marijuana, at least five years since he last used
cocaine, and that he had last used alcohol in September 2009.  Tr. 45.  He received substance
abuse treatment for the first time while staying at the Salvation Army.  Tr. 46.

**2.      Vocational Expert's Testimony**

Vocational Expert Deborah Lee ("VE") testified at the hearing.  Tr. 55-64.  The VE
stated that it did not appear that Martin's work in the last 15 years had reached the level of
substantial gainful activity.  Tr. 58.  The ALJ's first hypothetical asked the VE to consider a
person capable of performing a full range of exertional work and capable of moderately complex
tasks in a setting without over the shoulder supervision.  Tr. 58. The VE concluded that such an
individual would be capable of performing the jobs of cook helper, kitchen helper, and industrial
cleaner.  Tr. 58-59.

The ALJ then included an additional limitation that the hypothetical individual would be able to do independent tasks that do not require cooperation with others for task completion.  Tr. 59.  The VE concluded that such an individual would still be capable of the three example jobs.  Tr. 59.  The ALJ then added to the hypothetical a limitation that the individual would be able to work in a static setting with no strict production quotas or speedy performance.  Tr. 59.  The VE again concluded that the three previously indicated jobs would still be available.  Tr. 59.  The third additional limitation added by the ALJ required that the hypothetical individual not supervise others or have responsibility for resolving conflict in the work setting.  Tr. 59.  The VE testified that such an individual would still be capable of performing the three jobs.  Tr. 59.  The ALJ added as a final limitation to the hypothetical that the individual would retain the ability to learn and perform simple, repetitive tasks in a nonpublic environment where tasks are routine and predictable and production standards are flexible.  Tr. 60.  Again, the VE answered that such an individual would be able to perform the three example jobs provided.  Tr. 60.

Martin's counsel then asked the VE to add additional limitations to the hypothetical she had previously considered: no requirement of carrying items that could cause injury or damage, and only occasional handling and carrying with the dominant hand.  Tr. 61.  The VE concluded that there would be no jobs for an individual with those limitations.  Tr. 63-64.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her September 1, 2010, decision, the ALJ made the following findings:

1.  Martin had not engaged in substantial gainful activity since June 18, 2008, the application date.  Tr. 11.

2.  Martin has the following severe impairments: depression; anxiety-related disorder; post-traumatic stress disorder (PTSD); personality disorder; and substance addiction disorder.[9]  Tr. 11.

3.  Martin does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.  Tr. 11-13.

4.  Martin has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: can perform moderately complex tasks in a setting without over-the-shoulder supervision (i.e. more remote supervision); can perform independent tasks not requiring cooperation with others for task completion; can perform work in a static setting with no strict production quotas or speedy performance; cannot supervise others or have responsibility for conflict resolution; and retains the capacity to learn and perform simple, repetitive tasks in a non-public environment where tasks are routine and predictable and production standards are flexible.  Tr. 13-17.

5.  Martin has no past relevant work.  Tr. 17.

6.  Martin was born on February 7, 1966 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 17.

7.  Martin has at least a high school education and is able to communicate in English.  Tr. 17.

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 17.

9.  Considering Martin's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 17-18.

---

[9] The ALJ also found that Martin had no severe physical impairments (Tr. 11); Martin does not dispute those findings.

Based on the foregoing, the ALJ determined that Martin had not been under a disability since June 18, 2008, the date the application was filed.  Tr. 18.

### V. Parties' Arguments

**A.  Plaintiff's Arguments**

Martin argues that the ALJ did not fully account for his mental limitations in his residual functional capacity ("RFC") and subsequent hypothetical questions to the VE.  Doc. 12, p. 10.  Specifically, he argues that the evidence supports stricter limitations on his ability to interact with others (Doc. 12, p. 13-15) and a greater limitation on his ability to maintain concentration (Doc. 12, p. 15).

**B.  Defendant's Arguments**

In response, the Commissioner argues that the limitations described by the ALJ in both the RFC and hypothetical questions are supported by substantial evidence in the record.[10]  Doc. 13, p. 16-19.  Specifically, the Commissioner argues that the ALJ accounted for Martin's limitations in concentration by limiting him, in the RFC, to: moderately complex tasks; a static setting with no strict production quotas or speedy performance; and the capacity to learn and perform simple, repetitive tasks where such tasks are routine and predictable and production standards are flexible. Doc. 13, p. 17.  Further, the Commissioner argues that the ALJ accounted for Martin's limitations in interacting with others by limiting him, in the RFC, to work: that involved no over the shoulder supervision; independent tasks not requiring cooperation with others; and no supervision of others or responsibility for conflict resolution.  Doc. 13, p. 18.  The Commissioner asserts that because the ALJ reasonably assessed the RFC, the VE hypothetical that reflects the limitations in the RFC rests on substantial evidence as well.  Doc. 13, p. 19.

---

[10] The RFC adopted by the ALJ was a combination of the hypothetical questions posed to the VE.  Tr. 13, 58-60.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 416.945(a)(3), 416.946(c), 416.927; *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC."); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  "Hypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Soc. Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  As shown below, the ALJ's RFC and corresponding VE hypothetical are supported by substantial evidence.  Accordingly, the ALJ's reliance thereon was proper and the Commissioner's decision should be affirmed.

**A.**    **The ALJ properly accounted for Martin's limitations in concentration.**

Martin argues that evidence regarding "a troubled childhood and longstanding mental health condition involving psychotic features" requires finding a more limited ability to maintain concentration than was given to the VE in the ALJ's hypothetical. Doc. 12, p. 12, 15.  In support of his argument, he points to the conclusion of the consulting physician Dr. House, to whom the ALJ gave great weight, and who found that Martin's "concentration and attention are at least moderately limited." Tr. 526.  Martin contrasts that opinion with the ALJ's finding that Martin has "moderate difficulties" in concentration, persistence, or pace (Tr. 12).  Martin argues that the ALJ's failure to consider Dr. House's opinion as an opinion that Martin had "moderate *or greater* deficits" (emphasis supplied) in concentration and attention and incorporate such *greater* deficits resulted in a flawed hypothetical question posed to the VE.  Doc. 12, p. 13.  However, the ALJ's finding of moderate difficulties in concentration, persistence, or pace is consistent with Dr. House's opinion that Martin's "concentration and attention are at least moderately limited." Tr. 526.

Moreover, both Drs. Haskins and Swain, to whom the ALJ also gave great weight, concluded that Martin did not have anything greater than moderate limitations in the eight categories under sustained concentration and persistence in their residual functional capacity assessments.  Tr. 529-30, 643-44.  Dr. Dietz also agreed with Dr. Swain's assessment in its entirety.  Tr. 647.  There is thus substantial evidence in the record to support the ALJ's conclusion that Martin had moderate, rather than greater than moderate, limitations in concentration and properly accounted for those moderate limitations.  Accordingly, the ALJ's reliance upon the VE's testimony in response to the hypothetical containing the limitations that the ALJ determined to be proper constitutes substantial evidence to support the Commissioner's

decision.  *See Parks*, 413 Fed. Appx. at 865 ("Hypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible.").

**B.**      **The ALJ properly accounted for Martin's limitations in interacting with others.**

Martin argues that the evidence requires finding a more isolated work environment than the one expressed in the ALJ's hypothetical.  Doc 12, p. 15.  He points to evidence of his mood swings and "angry thoughts," isolation from others, and his history of violent altercations both as a victim and perpetrator.  Doc. 12, p. 14.  He also points to his job sorting donations at the Salvation Army which, although it did not rise to the level of substantial gainful activity, showed he did not work around others; he would also lash out at coworkers.  Doc. 12, p. 14.  He argues that the ALJ did not consider this inability to work with others in her hypothetical question. Doc. 12, p. 14 ("he did not work around others, a limitation not included in [the ALJ's] hypothetical question").

The ALJ, in both her RFC and hypothetical, asked the VE to consider limitations of: a work setting without over the shoulder supervision (i.e. more remote supervision); independent tasks not requiring cooperation with others for task performance; inability to supervise others or have responsibility for conflict resolution; and a non-public environment.  Tr. 13.  These restrictions are supported by substantial evidence and properly accounted for Martin's limitations in interacting with others.  *See* Tr. 526 (Dr. House opining moderate limitations in ability to "relate to others and deal with the general public"); Tr. 530, 532 (Dr. Haskins opining some moderate limitations in social interaction and corresponding limitations in work environment); Tr. 644-45 (Dr. Swain opining some moderate limitations in social interaction, indicating Martin "would likely perform best in a more solitary setting without over-the-shoulder supervision").

Inasmuch as the RFC, upon which the hypothetical is based, is supported by substantial evidence, even if Martin could demonstrate that substantial evidence also exists to support his position, the Commissioner's decision cannot be overturned. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Furthermore, the ALJ's hypothetical described the precise limitation Martin argues was not included at all: work that is essentially solitary. Jobs meeting the description in the hypothetical would not have a supervisor closely scrutinizing the work, tasks would be independent and require no supervision of others (thus not involving coworkers), and would not involve the public. Because the VE's conclusion that the jobs of cook helper, kitchen helper, and industrial cleaner would be available was based on an accurate description of Martin's limitations in working with others, the VE's opinion constituted substantial evidence on which the ALJ properly relied.

### VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.


Dated:   April 12, 2013

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).